UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
VAAD L'HAFOTZAS SICHOS, INC.,
and ZALMAN CHANIN,

               Plaintiffs,

     -against-

CHAIM YEHUDAH KRINSKY,
YOSSEF B. FRIEDMAN, MERKOS
L'INYONEI CHINUCH, INC.,
AGUDAS CHASIDEI CHABAD OF
THE UNITED STATES, and JOHN
DOES 1-10,

              Defendants.

------------------------------------------------x

**MEMORANDUM AND ORDER**
No. 11-CV-5658 (FB) (JO)

*Appearances:*
*For the Plaintiffs:*
MITCHELL C. SHAPIRO, ESQ.
Carter Ledyard & Milburn LLP
2 Wall Street
New York, New York 10005

*For Defendants Krinsky, Friedman*
*and Agudas Chasidei Chabad of the*
*United States:*
J. CHRISTOPHER JENSEN, ESQ.
KIERAN G. DOYLE, ESQ.
THOMAS KJELLBERG, ESQ.
SCOTT P. CERESIA, ESQ.
Cowan, Liebowitz & Latman, P.C.
1133 Avenue of the Americas
New York, New York 10036-6799

*For Defendant Merkos L'Inyonei*
*Chinuch, Inc.:*
IRA J. LEVY, ESQ.
JOHNATHAN A. AUERBACH, ESQ.
Goodwin Procter LLP
620 Eighth Avenue
New York, New York 10018

**BLOCK, Senior District Judge:**

For the third time, the Court is called upon to adjudicate an aspect of the seemingly never-ending dispute precipitated by the passing of the Lubavitcher Rebbe, Menachem Mendel Schneerson ("the Rebbe"). *See Merkos L'Inyonei Chinuch, Inc. v. Sharf*, 172 F. Supp. 2d 383 (E.D.N.Y. 2001); *Vaad L'Hafotzas Sichos, Inc. v. Kehot Publ'n Soc.*, 935 F. Supp. 2d 595 (E.D.N.Y. 2013) ("*Vaad I*").[1] Even a matter as final as death is a subject of debate in the Lubavitcher community, with some holding the "heartfelt belief that, notwithstanding his physical passing in 1994, the Rebbe still lives." *Sharf*, 172 F. Supp. at 384; *see also Vaad I*, 935 F. Supp. 2d. at 597-99 (summarizing history of the Lubavitcher community).

Though perhaps more mundane, the matter before the Court is no less fiercely disputed. At issue is the right to publish the *Likkutei Sichos*—literally, the "collected talks" given by the Rebbe—and ancillary works. For the following reasons, the Court concludes that there is an issue of fact as to the authorship of one of the works, but that plaintiffs cannot prevent defendants from publishing any of the other works.

---

[1]*Vaad I* involves registration of a trademark in a logo used on publications circulating in the Lubavitcher community. The Court upheld the decision of the United States Patent and Trademark Office approving registration, and held that issues of fact precluded summary judgment on infringement. *See* 935 F. Supp. 2d at 602. A bench trial is scheduled to begin on October 13, 2015.

# I

The history of the Lubavitcher community is summarized in *Vaad I*, 935 F. Supp. 2d. at 597-99.  The following additional facts place the present case within the context of that history.

The Rebbe gave numerous talks (*sichos*) throughout his lifetime.  Many were given on the Sabbath and holidays, when religious doctrine prohibited writing and recording.  As a result, some of the Rebbe's followers would memorize a talk and transcribe it when they were able.

The *sichos* were initially circulated unedited within the Lubavitcher community. Beginning in the late 1950s, the Rebbe undertook to formalize the process.  He chose volunteers from among his students to review the transcribed *sichos*, edit them for grammar and add footnotes citing source material.  The volunteers then submitted their work to the Rebbe, who would review and revise the drafts.  After at least two rounds of review and revision, he would approve the drafts for publication.  First published in pamphlet form, the *sichos* would eventually be collected into bound volumes: the *Likkutei Sichos*.  The first volume was published in the early 1960s.

In 1967, an enterprising volunteer—Rabbi Benzion Shemtov—proposed restructuring the editing and publishing operation.  With the Rebbe's approval, he organized several yeshiva students, including plaintiff Zalman Chanin, into an entity

dubbed Vaad L'Hafotzas Sichos (literally, "council for distribution of the *sichos*").
Vaad—the other plaintiff in this case—was formally incorporated in 1976. Rabbi
Chanin, along with Rabbi Nachman Schapiro and Rabbi Sholom Jacobson, has served
on Vaad's board of directors from that time to the present.

All told, thirty-nine volumes of the *Likkutei Sichos* have been published. The
title page of each volume clearly lists the Rebbe, with no mention of any co-author or
editor. Less clear is the actual publisher of the volumes. The colophon of the first
edition, published around 1990, recites that it was "published and copyrighted by" the
Kehot Publication Society, an unincorporated division of defendant Merkos L'Inyonei
Chinuch, Inc., the Lubavitcher community's "center for educational affairs." Pls.'
Exs. in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Exs."), Ex. 1C. The third edition,
published in 1997, was ostensibly "published and copyright by" Vaad. *Id.*, Ex. 1B.
Moreover, Vaad attests—without apparent contradiction—that Merkos and the
community's umbrella organization, defendant Agudas Chasidei Chabad of the United
States, continued to purchase copies of the *Likkutei Sichos* published by Vaad, even
after the Rebbe's passing.

In 1998, Vaad registered the *Likkutei Sichos* with the United States Copyright
Office. The application listed Vaad as the sole author on the theory that the work was
the result of Vaad's hiring out the "compilation, editing, and translation of lectures."

4

Decl. of Jonathan A. Auerbech, Ex. 14.  The application further recited that the work was created between 1972 and 1998 and first published on April 10, 1998.  *Id.*

The relationship between plaintiffs and defendants eventually soured in many respects.  As best the Court can glean, the triggering event for this litigation was the dispute, mentioned above, over the nature of the Rebbe's departure from this world.  In Vaad's version of the *Likkutei Sichos*, the Rebbe's name was followed by *shlita* (שליט״א), a Hebrew acronym meaning, roughly, "may he live a good, long life, amen."  Pls.' Exs., Ex. 1B.  Vaad attests that after the Rebbe's passing, the defendants demanded that Vaad replace the phrase with "of blessed memory."[2]  Pls.' R. 56.1 Statement ¶ 60.  When Vaad refused, Merkos "published a version of the 39 volume *Likkutei Sichos* that was virtually identical to the set that Vaad had previously published."  *Id.* ¶ 58.

On November 18, 2011, Vaad and Chanin filed suit against Merkos and Agudas, as well as named and unnamed individuals involved in their operations.  They asserted claims for copyright infringement; unfair competition; unjust enrichment; tortious interference with contracts, business relationships and prospective business relations; enforcement of a rabbinical court ruling; breach of fiduciary duty; and conversion.  In addition to denying wrongdoing, the defendants counterclaimed for

_____

[2]Presumably, *zekher tzadik livrakha* (זכר צדיק לברכה), or something similar.

a declaratory judgment invalidating Vaad's copyright registration as having been procured by fraud.

At the same time plaintiffs filed their complaint, Vaad applied to register copyrights in six other works:

- *Hadronim Al Ha'Shas*

- *Sefer Ha'Maamorim Meluket/Sefer Ha'Maamorim Bosi L'Gani*

- *Biurim L'Pirush Rashi Al Ha'Torah*

- *Biurim L'Pirkei Avos*

- *Hilchos Beis Habchira Im Chiddushim Ubiurim*

- *Hagada Shel Pesach Im Likkutei Taamim, Minhagim Ubiurim*

As with the *Likkutei Sichos*, Vaad claimed to be the work-for-hire author of the six works.  It listed initial publication dates ranging from September 1993 (for the *Hadronim Al Ha'Shas*) to July 2011 (for the *Hilchos Beis Habchira*).  Registrations were thereafter issued between November 30, 2011, and August 21, 2012, after which the Court allowed plaintiffs leave to amend the complaint to add infringement claims based on the additional works.

Defendants now move for summary judgment on all of plaintiffs' claims. Plaintiffs cross-move for partial summary judgment as to copyright infringement, unfair competition and defendants' counterclaim.

## II

Neither plaintiffs' response to defendants' motion for summary judgment nor their own motion for partial summary judgment addresses their claims for unjust enrichment; tortious interference with contracts, business relationships and prospective business relations; enforcement of a rabbinical court ruling; breach of fiduciary duty; or conversion. The Court deems those claims (embodied in the fifth through tenth causes of action of their complaint) abandoned. *See Jackson v. Federal Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to summary judgment] that relevant claims or defenses that are not defended have been abandoned."). Thus, the claims remaining for adjudication are (A) plaintiffs' claim for copyright infringement, (B) defendants' counterclaim seeking cancellation of plaintiffs' copyright registration, and (C) plaintiffs' claims for unfair competition.

## A. Copyright Infringement

"In order to make out a claim of copyright infringement[,] a plaintiff must establish three things: 1) that his work is protected by a valid copyright, 2) that the defendant copied his work, and 3) that the copying was wrongful." *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 100 (2d Cir. 2014). In this case, the first element is dispositive.

At the outset, it is important to stress that the issue is whether *Vaad* holds a valid copyright in the *Likkutei Sichos* or any of the additional works. The plaintiffs devote a substantial part of their briefs to arguing that *Merkos* did not have a license or other permission to reproduce the work. But if Vaad does not have a copyright in a particular work, then it lacks standing to challenge Merkos's actions with respect to that work.

Similarly, the plaintiffs argue at length that the Rebbe did not intend to secure any copyright for himself. In the first place, the creation of a copyright is not a matter of intent; it depends, as explained below, on the question of authorship. Moreover, even if the Rebbe's intent were relevant—to the extent, for example, that he intended to abandon any copyright he may have acquired—it would show only that the work was in the public domain, *not* that the copyright passed to Vaad. Of course, "ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law," 17 U.S.C. § 201(d)(1); but Vaad makes no such claim to ownership and there is, in any event, no evidence of a transfer meeting the statutory requisites. *See id.* § 204(a) (requiring transfer to be evidenced by signed writing).

In sum, the sole issue the Court must decide is whether Vaad has a valid copyright in the *Likkutei Sichos* or any of the additional works, or more precisely,

whether there is a genuine dispute of facts material to that question. First, however, the Court must address the burden of proof.

A registered copyright constitutes "prima facie evidence of the validity of the copyright and of the facts stated in the [registration] certificate," but only with respect to registrations made "before or within five years after first publication of the work." 17 U.S.C. § 410(c). "The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court." *Id.*

As a practical matter, a defendant must come forward with evidence that a registered copyright is invalid at the summary judgment stage—regardless of first publication date—because the court may otherwise accord at least some evidentiary weight to registration of an older work. *See, e.g.*, *Yurman Design, Inc. v. Golden Treasure Imports, Inc.*, 275 F. Supp. 2d. 506, 515-16 (S.D.N.Y. 2003) (granting summary judgment for plaintiff because "the record reveals absolutely . . . nothing that would raise any question as to the validity of the copyrights [in older works] covered by the registration certificates"). That said, the validity of a registered copyright can be challenged on any number of grounds. *See, e.g., Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997) ("The presumption has been overcome . . . by evidence that the work had been copied from the public domain, or by evidence that the work was a non-copyrightable utilitarian article." (citations omitted)).

As laid out below, the defendants have offered sufficient undisputed evidence to establish, as a matter of law, that Vaad does not have a copyright in either the *Likkutei Sichos* or in any of the additional works, save one. With respect to the *Hagada Shel Pesach*, there is a genuine issue of fact as to authorship precluding summary judgment.

## 1. The Work-for-Hire Doctrine

"Copyright in a work . . . vests initially in the author or authors of the work." 17 U.S.C. § 201. "As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). A work is "fixed" when it is embodied in a copy that is "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. § 101.

Vaad, of course, is a corporation. The Supreme Court's description of an author as a "person" was not accidental; individuals, not entities, create ideas and give them expression.

Nevertheless, corporations and like entities can obtain copyrights through the concept of a "work made for hire," which the Copyright Act defines as either "a work prepared by an employee within the scope of his or employment," or one of nine

specific types of works "if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101. "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author . . . and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b).

The Supreme Court has cautioned courts not to conflate the two means of creating a work for hire: "[The Copyright Act] plainly creates two distinct ways in which a work can be deemed for hire: one for works prepared by employees, the other for those specially ordered or commissioned works which fall within one of the nine enumerated categories and are the subject of a written agreement." *Reid*, 490 U.S. at 741.

As evidenced by its application for registration, Vaad considers the *Likkutei Sichos* a work made for hire. Since there is no evidence of a signed writing designating it as such, its theory depends on whether the work was created by an employee within the scope of his or employment. In this context, "the term 'employee' should be understood in light of the general common law of agency," *id.*:

> Among the other factors relevant to this inquiry are the skill required; the
> source of the instrumentalities and tools; the location of the work; the
> duration of the relationship between the parties; whether the hiring party

has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 751-52 (footnotes omitted)

As defendants point out, a work-for-hire theory is problematic for Vaad because it could not have been the work-for-hire author of any work before it came into existence. Although Vaad protests that it was a functioning entity prior to its formal incorporation, it still can have no claim to any part of the *Likkutei Sichos* created before its own creation in 1967. In addition, it is not clear that every individual who worked on the *Likkutei Sichos* did so as an employee of Vaad under the definition set out in *Reid.*

There is, however, a more fundamental issue. The work-for-hire doctrine is universally described as an exception to the usual rule of authorship. *See id.* at 737 ("The Act carves out an important exception . . . for 'works made for hire.'"). That is, the doctrine does no more than vest copyright ownership in someone other than the person who would have had ownership under the usual rule. Thus, one claiming a copyright under the work-for-hire doctrine must have employed the actual author of the work.

## 2. Was the *Likkutei Sichos* authored by an employee of Vaad?

Vaad does not contend that it was the author of the Rebbe's transcribed *sichos* because it acknowledges—surprisingly reluctantly, under the circumstances—that the transcripts were preexisting works.[3]  Instead, it contends that those acting on its behalf "authored" at least part of the *Likkutei Sichos* through the "compilation, editing, and translation of" the transcribed *sichos*.  Decl. of Jonathan A. Auerbach, Ex. 14.  With respect to the balance of the work, it claims protection as a derivative work based on those transcripts.

Both compilations and derivative works start with preexisting material.  In a compilation, the preexisting material is "selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101.  In a derivative work, it is modified in some manner into a "translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted."  *Id.*

---

[3]Curiously, however, Vaad argues that the Rebbe was not the author, either, because he did not play a role in "fixing" the oral *sichos* into a reproducible medium by transcribing them.  Fixation may be done "by *or under the authority of* the author."  17 U.S.C. § 101 (emphasis added). In any event, Vaad's argument once again confuses the abstract issue of who authored the transcribed *sichos* with the relevant issue of whether Vaad did.

Both compilations and derivative works can be protected by copyright only if—and only to the extent that—they are original. With respect to compilations, the "principal focus" of the originality inquiry is "whether the selection, coordination, and arrangement are sufficiently original to merit protection." *Feist Publ'ns v. Rural Tel. Serv. Co.*, 499 U.S. 340, 358 (1991). With respect to derivative works, the focus is on the amount of modification to the preexisting work. *See L. Batlin & Son v. Snyder*, 536 F.2d 486, 491 (2d Cir. 1976) ("To support a copyright [in a derivative work] there must be at least some substantial variation, not merely a trivial variation such as might occur in the translation to a different medium."). In neither case does the copyright extend to rights in the preexisting material. *See* 17 U.S.C. § 103(b) ("The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material.").

The originality requirement is not unique to compilations and derivative works; it is the very foundation of copyright protection. *See Wood v. Bourne Co.*, 60 F.3d 978, 990 (2d Cir. 1995) ("The basis for copyright protection contained in both the constitution and the Copyright Act is originality of authorship."). The standard for originality is low, but it nevertheless excludes some works from copyright protection: "No matter how poor the author's addition, it is enough if it be his own." *Alfred Bell*

& Co. v. Catalda Fine Arts, Inc., 191 F.2d 99, 103 (2d Cir.1951) (internal quotation marks omitted). Thus, "[t]he 'originality' standard requires that the work result from 'independent creation' and that the author demonstrate that such creation entails a 'modicum of creativity.'" *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 674, 681 (2d Cir. 1998) (quoting *Feist*, 499 U.S. at 346).

Even accepting plaintiffs' premise that the *Likkutei Sichos* is either a compilation or a derivative work, their claim of original contribution founders on two shoals. First, plaintiffs lay heavy emphasis on the time, money and effort expended in transforming the transcribed *sichos* into the thirty-nine bound volumes of the *Likkutei Sichos*. The Supreme Court has flatly rejected this "sweat of the brow" theory of copyright. *See Feist*, 499 U.S. at 353, 355 ("Decisions of this Court applying the 1909 Act make clear that the statute did not permit the 'sweat of the brow' approach. . . . To ensure that the mistakes of the 'sweat of the brow' courts would not be repeated, Congress took additional measures [in the 1976 Act].").

Second, plaintiffs posit that any creative contribution to a work makes the contributor an author of the work, with a copyright at least to the extent of his contribution. This argument fairly states the creativity prong of the test for originality, but completely ignores that "originality [also] requires independent creation." *Feist*, 499 U.S. at 346. The record is clear that every part of the *Likkutei Sichos*—from the

15

transcribed *sichos* themselves, to their selection and arrangement, to the footnotes offering source material and explanatory passages—was subject to the Rebbe's revision and approval. Such an arrangement forecloses the possibility that any part of the *Likkutei Sichos* was the independent creation of those working for Vaad.

It is true, of course, that a single work can have more than one author. "A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." *See* 17 U.S.C. § 101. "The authors of a joint work are coowners of copyright in the work." *Id.* § 201(a).

In *Childress v. Taylor*, 945 F.2d 500 (2d Cir. 1991), the Second Circuit examined "the crucial aspect of joint authorship—the nature of the intent that must be entertained by each putative joint author at the time the contribution of each was created." *Id.* at 507. It concluded that the relevant inquiry concerned, not "the state of mind regarding the unitary nature of the finished work," but "how the putative joint authors regarded themselves in relation to the work." *Id.* at 507, 508. Its reasoning bears repeating here:

> [A] writer frequently works with an editor who makes numerous useful revisions to the first draft, some of which will consist of additions of copyrightable expression. Both intend their contributions to be merged into inseparable parts of a unitary whole, yet very few editors and even fewer writers would expect the editor to be accorded the status of joint

author, enjoying an undivided half interest in the copyright in the published work. Similarly, research assistants may on occasion contribute to an author some protectable expression or merely a sufficiently original selection of factual material as would be entitled to a copyright, yet not be entitled to be regarded as a joint author of the work in which the contributed material appears. What distinguishes the writer-editor relationship and the writer-researcher relationship from the true joint author relationship is the lack of intent of both participants in the venture to regard themselves as joint authors.

*Id.* at 507. *Childress* thus confirms that a even a separately copyrightable contribution to a work does not automatically make the contributor an author of the work.

In *Thomson v. Larson*, 147 F.3d 195 (2d Cir. 1998), the Second Circuit elaborated on three common indicia of joint authorship suggested in *Childress*. First, "an important indicator of authorship is a contributor's decisionmaking authority over what changes are made and what is included in a work." *Id.* at 202-03. Vaad cites numerous examples of its decision-making authority over production and distribution decisions. As noted, however, the final arbiter of the *content* of the *Likkutei Sichos* was the Rebbe.

Second, "in discerning how parties viewed themselves in relation to a work, *Childress* also deemed the way in which the parties bill or credit themselves to be significant." *Id.* at 203 (citing 945 F.2d at 508). Each volume of the *Likkuetei Sichos* credits the Rebbe—and only the Rebbe—on its title page. Vaad points out that it is

listed as the publisher on some volumes, but this, too, confuses the production of a physical book with the creation of its content.

Third, "[j]ust as the parties' written agreements with each other can constitute evidence of whether the parties considered themselves to be co-authors, so the parties' agreements with outsiders also can provide insight into co-authorship intent, albeit to a somewhat more attenuated degree." *Id.* at 204. Vaad alludes generally to contracts and agreements it made with third parties in carrying out its business. What is missing is any evidence that those contracts represented Vaad to be an author, joint or otherwise, of the *Likkutei Sichos*.

In sum, it is clear that Vaad and those under its aegis made an invaluable contribution to the publication to the *Likkutei Sichos*. It is equally clear, however, that their contribution was not of a type giving rise to a copyright in that work. In other words, defendants have conclusively rebutted the presumption of validity that attached to Vaad's copyright registration for the *Likkutei Sichos*. Without a valid copyright, Vaad's claim for infringement of that work must fail.

**3. Were any of the additional works authored by an employee of Vaad?**

It is undisputed that each of the six additional works registered by Vaad contains portions of the *Likkutei Sichos*. However, each also involves at least some modification of that work. The question is whether any of those modifications were

18

the original and independent creation of an employee of Vaad. Since it is undisputed

that none of the defendants publishes *Hadronim Al Ha'Shas*, the Court confines its

analysis to the other five works.

With respect to the *Seforim Ha'Maamorim*—collections of dissertations by the

Rebbe—defendants have offered evidence that the works were created by Rabbi Yoel

Kahan, assisted by Rabbi David Feldman, acting at the behest of a separate

organization, Vaad Hanochos B'Lahak. While Vaad contends that it paid some of the

expenses of publishing the volumes, it offers no evidence of its involvement in the

creation of their content.

With respect to the *Biurim L'Pirush Rashi Al Ha'Torah*—a compilation of the

Rebbe's discussions of Torah commentary by Rabbi Shlomo Yitzchaki (known as

"Rashi")—and the *Biurim L'Pirkei Avos*—a compilation of the Rebbe's discussions

of the *Pirkei Avos* ("Ethics of the Fathers")—it is undisputed that the works were

created by Rabbi Eli Friedman. Similarly, the *Hilchos Beis Habchira Im Chiddushim*

*Ubiurim*—the Rebbe's discussions of the digest of Talmudic commentary compiled

by Rabbi Menachem Meiri—consisted solely of material edited either by the Rebbe

himself or Rabbi Avraham Baruch Pevsner.

Both Rabbi Friedman and Rabbi Pevsner were paid by Vaad. Payment alone,

however, is insufficient to establish one of the two relationships that can give rise to

a work for hire.  As noted, there is no evidence of a signed writing specifically designating the works as commissioned works for hire.  With respect to employment, there is no evidence that the relationship between Vaad and either Rabbi Friedman or Rabbi Pevsner was one of employer-employee under any of the criteria set forth in *Reid*.

Finally, there is the *Hagada Shel Pesach*.  The first part of the work consists of the text of and the Rebbe's commentary on the *Haggadah*, which lays out the order of the Passover seder.  The second part is a compilation of *sichos* and other writings by the Rebbe that are relevant to the celebration of that holiday.

The first part of the *Hagada Shel Pesach* was previously published by the Rebbe himself in 1946, and has apparently not been modified since.  Defendants contend that the second part consisted solely of material contained in the *Likkutei Sichos*.  Even assuming that to be true, however, anyone who compiled, edited or translated that work in such a way as to create an original compilation or derivative work would, as explained above, be an author of the new work, although he or she would have no copyright in the *Likkutei Sichos* itself.

According to its registration certificate, the *Hagada Shel Pesach* was first published in 2003.  Thus, registration in 2011 does not create a presumption of

validity. However, Rabbi Jacob Leib Altein gave the following account of the creation of the *Hagada Shel Pesach* at his deposition:

> [W]e had to extract those portions [of the *sichos*] which were directly connected to the *Haggadah* . . . . We had to omit those parts which weren't directly connected to the *Haggadah*. So it did involve editorial [decisions].

Pls. Exs., Ex. 30 at 37. This is some evidence that there was a minimal level of independent creativity involved in deciding which excerpts from the *Likkutei Sichos* to include in the new work. Moreover, Rabbi Altein's use of "we" implies that he was involved in those creative decisions, and defendants concede that he was a member of Vaad's editorial staff. However, the evidence is hardly conclusive for purposes of summary judgment.

In sum, there is a genuine issue of fact regarding Vaad's work-for-hire authorship of the *Hagada Shel Pesach*. With respect to the other additional works, however, defendants have offered sufficient undisputed evidence to demonstrate that Vaad is not the work-for-hire author.

## B. Copyright Cancellation

The defendants claim that Vaad obtained a registered copyright in the *Likkutei Sichos* and the additional works by falsely claiming authorship in its registration applications. With respect to the *Lukketei Sichos*, they seek affirmative relief in the

form of cancellation of the registration. But "there is no precedent supporting the use of a claim for fraud on the Copyright Office as an affirmative cause of action." *Kwan v. Schlein*, 2008 WL 4755345, *2 (S.D.N.Y. Oct. 30, 2008); *accord Brownstein v. Lindsay*, 742 F.3d 55, 77 (3d Cir. 2013) ("Courts have no authority to cancel copyright registrations because that authority resides exclusively with the Copyright Office.").

Fraud on the Copyright Office is, however, recognized as one of the various ways in which a registered copyright can be challenged as a defense to infringement. *See Fonar Corp.*, 105 F.3d at 105 ("We have considered challenges to the presumption of validity where a showing has been offered—by way of a defense to an infringement claim—that there has been a fraud upon the copyright office."). In this respect, the defendants claim fraud with respect to all of the works. Of course, the Court need address the defense only with respect to the *Hagada Shel Pesach*, having already granted summary judgment on the other works.

Where, as here, the fraud defense is based on an allegedly false representation of authorship, it serves no practical purpose. If the defendant proves that the plaintiff was not the author, then there can be no infringement; the plaintiff's *scienter* is irrelevant.

In any event, the only evidence of "fraud" is that Vaad held itself out to be the work-for-hire author of the works. With respect to the *Hagada Shel Pesach*, the Court has concluded that there is a genuine dispute as to that issue. Thus, an intent to deceive the Copyright Office cannot be inferred merely from the fact that Vaad claims authorship.

## C. Unfair Competition

Plaintiffs contend that Merkos's publication and sale of its own version of the *Likkutei Sichos* misleads purchasers into believing Merkos compiled and edited the content of the work and/or had the Rebbe's approval to publish it. In other words, plaintiffs claim that Merkos is passing off its own version of the *Lukketei Sichos* as the version published by Vaad, in violation of the Lanham Act, the New York General Business Law and state common-law.

*Dastar Corp. v. Twentieth Century Fox Firm Corp.*, 539 U.S. 23 (2003), addresses the interplay between copyright—which protects authors' rights in their creations—and unfair competition laws—which protect consumers from, *inter alia*, confusion as to the origin of goods. While acknowledging that "[t]he purchaser of a novel is interested not merely, if at all, in the identity of the producer of the physical tome (the publisher), but also, and indeed primarily, in the identity of the creator of the story it conveys (the author)," the Supreme Court explained that "[t]he problem

23

with this argument according special treatment to communicative products is that it causes the Lanham Act to conflict with the law of copyright, which addresses that subject specifically." *Id.* at 33. Thus, it held that the phrase "origin of goods" "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Id.* at 37.

Under *Dastar*, then, the law of unfair competition does not allow a claim for false or misleading representations as to the origin of the content of a "communicative product."[4] Plaintiffs quibble that *Dastar* dealt only with reverse passing off, but that is incorrect. The Supreme Court construed the phrase "origin of goods," a concept implicated whether plaintiffs claim that Merkos passed off its own goods as Vaad's (passing off), or misappropriated goods belonging to Vaad and passed them off as its own (reverse passing off). *See Dastar*, 539 U.S. at 32 (defining passing off and reversing passing off).

In an attempt to salvage their claim, plaintiffs belatedly argue that their claim is based on a characteristic of the physical volumes of the *Likkutei Sichos*, namely, their trade dress. Plaintiffs have not, however, offered sufficient evidence (1) that the

---

[4]Although *Dastar* construed the Lanham Act, "it is well recognized that the standards for Section 43(a) claims of the Lanham Act and unfair competition claims under New York Law are almost indistinguishable." *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 363 (S.D.N.Y. 1998).

trade dress used by Vaad has acquired secondary meaning identifying the source of the books, or (2) that the trade dress used by Merkos is likely to cause consumer confusion as to source. To the extent the claim is based on Merkos's use of the "Kehot" logo, the Court has already held that the logo is presumptively owned by Merkos, *see Vaad L'Hafotzas Sichos, Inc. v. Kehot Publ'n Soc.*, 2014 WL 1026592, at *1 (E.D.N.Y. Mar 20, 2014) ("Registration of the trademark, which the Court upheld, entitles Merkos to an *evidentiary presumption* of validity, ownership and exclusive use."), and plaintiffs have not offered evidence to overcome the presumption.

## III

Plaintiffs' claim for infringement regarding the *Hagada Shel Pesach* shall proceed to trial. In all other respects, the complaint is dismissed. Defendants' counterclaim is also dismissed.

Plaintiffs have demanded a jury trial. Since they seek damages on their infringement claim, they are entitled to one. *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 355 (1998). If plaintiffs wish to withdraw their jury

demand, they must advise the Court forthwith.  Whether the matter is tried to a jury

or to the Court, trial shall begin on Monday, November 30, 2015.[5]

       **SO ORDERED**.

 

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
September 30, 2015

---

[5]Even if the plaintiffs withdraw their jury demand, the matter cannot reasonably be ready for trial by October 13th, when the bench trial in *Vaad I* is scheduled to begin.  Accordingly, the Court denies the motions to reconsider its prior decision not to consolidate this case with *Vaad I*.